

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 14 2010

JAMES N. HATTEN, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ORIGINAL

**CAP**

| | |
|---|---|
| GLOBAL VEHICLES U.S.A., INC., )<br>a Nevada corporation with its principal )<br>place of business in Alpharetta, Georgia, )<br>    ) | |
| Plaintiff, ) | **CIVIL ACTION FILE NO.** |
| ) | |
| v. ) | **1 10-CV-1818** |
| ) | |
| ) | |
| Mahindra & Mahindra, LTD., a company)<br>Incorporated and registered under the )<br>Indian Companies Act of 1913, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, Global Vehicles U.S.A., Inc. ("Global Vehicles") by and through

its undersigned attorneys, sues Defendant Mahindra & Mahindra, Ltd.

("Mahindra") and alleges as follows:

### NATURE OF THE ACTION

1.     Global Vehicles is a United States corporation based in Alpharetta,

Georgia that is engaged in the distribution of motor vehicles in the United States.

2.     Mahindra is a company incorporated and registered under the Indian

Companies Act of 1913 based in Mumbai, India that manufactures motor vehicles intended for export into the United States.

3.      On or about September 28, 2006, Global Vehicles and Mahindra executed a Distributor Agreement, whereby Global Vehicles became the exclusive distributor of Mahindra motor vehicles in the United States.[1]

4.      Over the past three and a half years, Global Vehicles has developed a nation-wide network consisting of close to 350 automobile dealers who stand ready to sell and service Mahindra vehicles to American consumers once the vehicles have been certified to meet U.S. emissions and safety standards, a process called "Homologation."

5.      Global Vehicles has expended significant resources to achieve this level of readiness for the sale of Mahindra vehicles in the United States.

6.      Specifically, Global Vehicles has spent close to $35 million in preparation for the launch of Mahindra vehicles in the United States, including: an initial distributor appointment fee paid to Mahindra in the amount of $8.5 million; an investment of $1 million dollars to assist Mahindra in the development of a

---

[1]   Copies of the Distributor Agreement dated September 28, 2006, the First Amendment to Distributor Agreement dated April 20, 2007, the Second Amendment to Distributor Agreement dated March 27, 2010, and the Third Amendment to Distributor Agreement dated May 25, 2010 are attached hereto as Exhibits A, B-1, B-2 and B-3, respectively.

sports utility vehicle (which Global Vehicles has demanded be refunded due to Mahindra's abandonment of this project); and other significant sums of money for dealer development, brand development, sales advertising, logistics infrastructure, IT infrastructure, test vehicles, and administrative costs

7.     At the same time, Global Vehicles' dealers have paid over $60 million in franchise fees to secure their rights to sell Mahindra vehicles and many of the dealers have invested significant sums of money in upgrading their dealerships to accommodate the sale of Mahindra vehicles.

8.     In contrast to Global Vehicles' commitment to the venture, Mahindra has anticipatorily breached its contractual obligations and otherwise engaged in bad faith dilatory conduct.

9.     For example, on August 17, 2009, Global Vehicles placed a vehicle order with Mahindra that was supported by an irrevocable letter of credit, in compliance with the terms of the Distributor Agreement ("the First Order").

10.     However, on August 25, 2009, Mahindra anticipatorily breached the Distributor Agreement by rejecting the First Order on the pretext that Global Vehicles had not provided sufficient evidence of its financial ability to pay for the vehicles and otherwise operate the distributorship business, even though Global Vehicles has no such obligation under the terms of the Distributor Agreement.

11.     Specifically, Mahindra demanded that Global Vehicles comply with unilaterally imposed, wholly extra-contractual and onerous requirements such as providing to Mahindra trade financing commitments, letters of credit supporting anticipated vehicle orders, dealer floor plans and retail financing for a period of **three years** for the ostensible purpose of ensuring the continuity and stability of Global Vehicles' business.

12.     On December 22, 2009, in a good faith effort to preserve the relationship between the parties, Global Vehicles placed another vehicle order ("the Second Order") to replace the First Order which had been wrongfully rejected by Mahindra, and submitted details of its financial arrangements and a projection of vehicle orders for the first year of production, notwithstanding the fact that it had no contractual obligation to do so.

13.     However, on December 30, 2009, Mahindra once again anticipatorily breached the Distributor Agreement by rejecting the Second Order on the pretext that Global Vehicles had not provided adequate "financial security" for the Second Order, the definition of which has never been provided and which is not even required under the Distributor Agreement.

14.     In addition to its wrongful rejection of the First Order and the Second Order, Mahindra has in bad faith significantly delayed the completion of the

- 4 -

above-described Homologation process.[2]

15.    Given Mahindra's anticipatory breaches, Global Vehicles has initiated an arbitration proceeding in accordance with the Distributor Agreement's Arbitration Clause[3] seeking a declaratory judgment regarding the parties' rights and obligations under the Distributor Agreement and an order compelling Mahindra to comply with its contractual obligations.

16.    As permitted by the Distributor Agreement, Global Vehicles brings this action to obtain a *status quo* injunction to enforce the provision in the Arbitration Clause that requires Mahindra to continue performing its obligations under the Distributor Agreement during the pendency of the arbitration proceeding.[4]

## THE PARTIES

17.    Global Vehicles is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Alpharetta, Georgia.

---

[2]    The initial date for completion of Homologation under the terms of the Distributor Agreement was August 31, 2009. Exh. A, at ¶ 10. This date was extended to March 31, 2010 in the First Amendment to Distributor Agreement, Exh. B-1, at ¶ 2, and further extended to May 31, 2010 in the Second Amendment to Distributor Agreement, Exh. B-2, at ¶ 2, and further extended to June 11, 2010 in the Third Amendment to Distributor Agreement, Exh. B-3, at ¶2.

[3]    Exh. A, at ¶ 60.

[4]    Id. at ¶¶ 60, 63.

18.    Mahindra is a company incorporated and registered under the Indian Companies Act of 1913, with its principal place of business in Mumbai, India.

## SUBJECT MATTER JURISDICTION AND VENUE

19.    This Court has diversity jurisdiction over this case pursuant to Title 28, United States Code, Section 1332(a)(2) because the matter in controversy (*i.e.*, the monetary value of the benefit that would flow to Global Vehicles if the injunctive relief requested in this action were granted) exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State of the United States and a citizen of a foreign state.

20.    Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PERSONAL JURISDICTION

21.    This Court has personal jurisdiction over Mahindra because, under the terms of the Distributor Agreement between the parties, Mahindra consented to the institution of an action for injunctive relief, such as the instant action, in the local or federal courts of the United States.

22.     Additionally, this Court has personal jurisdiction over Mahindra pursuant to Ga. Code § 9-10-91 (1) because this action arises from Mahindra's transacting business within Georgia.

## FACTUAL ALLEGATIONS

### *Global Vehicles and Mahindra Enter into the Distributor Agreement*

23.     In early 2006, Global Vehicles and Mahindra commenced negotiations for the appointment of Global Vehicles as the exclusive distributor of Mahindra vehicles in the United States.

24.     To this end, the parties executed a Letter of Intent on January 20, 2006 and a Memorandum of Understanding on March 10, 2006.

25.     Ultimately, on September 28, 2006, Global Vehicles and Mahindra executed a comprehensive Distributor Agreement.

26.     Pursuant to the Distributor Agreement, Mahindra granted Global Vehicles the exclusive right to distribute Mahindra vehicles in the United States for an initial term of ten years, with an optional renewal term of five additional years, in exchange for Global Vehicles' duly made payment of an appointment fee in the amount of $8.5 million.[5]

---

[5] Exh. A, at ¶¶ 3, 4.

27.    Global Vehicles, in turn, agreed to appoint suitable automobile dealers authorized to sell Mahindra vehicles throughout the United States.[6]

28.    At the time of execution of the Distributor Agreement, the parties contemplated that the first model of Mahindra vehicles designed for importation into the United States would be available for shipment in August, 2008, with subsequent models available in August, 2009 and the fourth quarter of fiscal year 2010 (*i.e.*, first calendar quarter of 2011).[7]   However, Mahindra was unable to comply with this requirement.

29.    Therefore, pursuant to the First Amendment to Distributor Agreement executed on April 20, 2007, the dates when Mahindra vehicles would be available for shipment were delayed, due solely to Mahindra's actions or inaction, to January-March 2009 for the first model, September 2009 for the second model, the end of 2009 for the third model, and January-March, 2011 for the fourth model.[8] Global Vehicles agreed to this amendment in a good faith effort to provide Mahindra additional time to comply with its obligations to manufacture and deliver the vehicles to Global Vehicles.

---

[6]  To date, Global Vehicles has appointed close to 350 such dealers.

[7]  Exh. A, Annexure IV.

[8]  Exh. B-1, Annexure II.  Mahindra did not meet any of the 2009 dates.

30.    The Distributor Agreement assigns to Mahindra the responsibility of obtaining certifications that the Mahindra vehicles to be imported into the United States meet Federal Motor Vehicle Safety Standards and Vehicle Emissions Control Requirements, a process referred to as "Homologation."[9]

31.    Moreover, under the terms of the Distributor Agreement, vehicle orders are to be secured solely by an irrevocable letter of credit in favor of Mahindra and payment for the vehicles is to be effectuated via international wire transfer within ten (10) days from receipt of the vehicles at the designated port of delivery.[10]

32.    However, Global Vehicles has no duty to place any vehicle orders until the "Homologation" process is completed.[11]

33.    The initial date for completion of the Homologation process of August 31, 2009 has been extended three times by mutual agreement of the parties—first to March 31, 2010, then to May 31, 2010, and subsequently to June 11, 2010.[12] Once again, Global Vehicles agreed to these extensions in a good faith effort to

---

[9] Exh. A, at ¶ 10.
[10] Exh. A, at ¶ 15.
[11] Exh. A, at ¶ 17.
[12] Exh. A, at ¶ 10; Exh. B-1, at ¶ 2; Exh. B-2, at ¶ 2; Exh. B-3, at ¶ 2.  To date, the Homologation process has not been completed.

provide Mahindra additional time to comply with its obligations to manufacture and deliver the vehicles to Global Vehicles.

### *Mahindra Unilaterally Attempts to Impose Extra-Contractual and Onerous Conditions on Global Vehicles*

34.    In 2008, in anticipation of the availability of Mahindra vehicles for shipment by early 2009, Global Vehicles engaged in the process of securing from established financial institutions the required financing for the purchase of the initial vehicle order.

35.    However, after Mahindra delayed the launch of the vehicles beyond the anticipated January-March, 2009 time frame, these financial institutions ceased the negotiations with Global Vehicles due to the uncertainty of the launch date caused by Mahindra.

36.    At a meeting held in Sarasota, Florida on May 12, 2009, Mahindra suggested that Global Vehicles secure a "strategic partner" to be approved by Mahindra that would assist Global Vehicles with obtaining a new credit line greater than initially contemplated or required under the Distributor Agreement and, at the same time, assist Global Vehicles' dealers in securing their own retail/wholesale financing.

37.    Notwithstanding the fact that Global Vehicles was under no such obligation under the terms of the Distributor Agreement and that such efforts

would detract from other company priorities, Global Vehicles agreed to pursue Mahindra's suggestion and immediately commenced efforts to obtain a strategic partner.

38.    On June 15 and 16, 2009, the parties met in Mumbai, India to address issues related to the launch of Mahindra vehicles, which by then had been delayed to the late 2009 to early 2010 timeframe.

39.    At that time, Mahindra continued in its attempts to impose extra-contractual duties on Global Vehicles by demanding that Global Vehicles place larger vehicle orders than originally contemplated or projected, even though the condition for the placing of such orders—successful Homologation of the vehicles—had not yet occurred, and secure financing both for itself and its dealers.

40.    In its continuing good faith efforts to preserve the parties' relationship, Global Vehicles engaged in extensive efforts to satisfy Mahindra's demands by approaching potential strategic partners and potential sources of financing alike.

41.    On July 15, 2009, Global Vehicles submitted to Mahindra a report of those efforts.[13]

42.    On July 17, 2009, Global Vehicles was stunned to receive

---

[13] A copy of Global Vehicles' July 15, 2009 correspondence is attached hereto as Exhibit C.

correspondence from Mahindra wherein the latter advised Global Vehicles that it would not be meeting the projected December 2009 vehicle launch and that it was putting on hold its plans to manufacture vehicles for sale in the United States due to Global Vehicles' purported failure to secure financing for the purchase of such vehicles.[14]

43.    Notwithstanding that the excessive "financing" Mahindra demanded Global Vehicles obtain was not required under the Distributor Agreement, the fact of the matter was that Global Vehicles did have sufficient financing in place to secure its vehicle orders per the Distributor Agreement.   Consequently, given Mahindra's prior assurances that the Homologation process would be completed by October, 2009, Global Vehicles advised Mahindra on July 24, 2009 that it would be placing its initial vehicle order on August 17, 2009 in time for late 2009 delivery.[15]

44.    Incredibly, on August 7, 2009, Mahindra responded to Global Vehicles' letter by restating its position that it required concrete evidence of Global Vehicles having obtained "financial backing" to support its vehicle orders before it

---

[14]  A copy of Mahindra's July 17, 2009 correspondence is attached hereto as Exhibit D.

[15]  A copy of Global Vehicles' July 24, 2009 correspondence is attached hereto as Exhibit E.

would proceed with the necessary steps for the Mahindra vehicle launch.[16]   Once again, this "financial backing" was undefined.

### *Mahindra Wrongfully Rejects Global Vehicles' First Order*

45.    On August 17, 2009, notwithstanding Mahindra's continuing delay of the completion of the Homologation process and failure to meet the initial vehicle delivery dates, but in anticipation that these delays would be cured, Global Vehicles placed its initial vehicle order with Mahindra supported by an irrevocable letter of credit, in compliance with the terms of the Distributor Agreement ("the First Order").[17]

46.    However, by correspondence dated August 25, 2009, Mahindra rejected the First Order on the pretextual grounds that Global Vehicles had not provided the required payment guarantee and had not otherwise demonstrated the financial ability to pay for this and future orders.[18]

47.    Specifically, Mahindra again demanded that Global Vehicles satisfy numerous unilaterally imposed and wholly extra-contractual and onerous conditions by supplying to Mahindra extensive financial documentation of, among

---

[16]   A copy of Mahindra's August 7, 2009 correspondence is attached hereto as Exhibit F.

[17]   A copy of the First Order is attached hereto as Exhibit G.

[18]   A copy of Mahindra's August 25, 2009 correspondence is attached hereto as Exhibit H.

other things, Global Vehicles' working capital, trade financing, letters of credit supporting future orders, proof of funding for future advertising and product support endeavors, dealer floor plans and retail financing, all for a period of **three years** hence.[19]

48.     On August 28, 2009, Global Vehicles, through counsel, responded to Mahindra's rejection of the First Order and advised that the rejection was a material breach of the Distributor Agreement, specifically refuting each and every reason advanced by Mahindra as purported justification for such rejection, including the above-mentioned unilaterally imposed demands for three years worth of detailed financial information.[20]

49.     Thereafter, the parties engaged in an exchange of correspondence wherein each maintained its earlier position, with Mahindra ultimately invoking the executive level dispute resolution provisions contained in the Distributor Agreement's Arbitration Clause.[21]

---

[19]  Exh. H, at 2.
[20]  A copy of Global Vehicles' August 28, 2009 correspondence is attached hereto as Exhibit I.
[21]  Copies of this correspondence, dated September 9, 2009, September 17, 2009 and September 30, 2009 are attached hereto as Exhibits J, K, and L, respectively. See also Exh. A, at ¶ 60(a).

50.    As a result of Mahindra's request for an executive level review, the parties met in New York City on November 3, 2009 to address the issues that had arisen in relation to the Distributor Agreement.

51.    At the conclusion of the meeting, the parties agreed to engage in further communications with respect to three specific issues, which Global Vehicles addressed in correspondence dated November 30, 2009.[22]

52.    Therein, Global Vehicles informed Mahindra, among other things, that it had secured trade financing from a third party.  Global Vehicles also provided to Mahindra its Trade Finance Program as per Distributor Agreement and Pro Forma Operational Income and Cash Flow Projections for the fifteen-month period from December, 2009 to February, 2011, reflecting the first year projections for anticipated order volumes assuming completion of the Homologation process by December 17, 2009 and demonstrating Global Vehicles' ability to both assist with the marketing of the vehicles and sustain its day to day business operations.[23]

53.    On December 11, 2009, Mahindra once again rejected Global Vehicles' proffer, repeating its now overused mantra that the financial information

---

[22] A copy of Global Vehicles' November 30, 2009 correspondence is attached hereto as Exhibit M.

[23] Exh. M, at 1.  Due to the confidential nature of the Trade Finance Program and Pro Forma Operational Income and Cash Flow Projections, Global Vehicles is not submitting these documents at this time but will make them available for the Court's review at the appropriate time.

being provided was somehow "insufficient," notwithstanding the fact that Global

Vehicles was under no obligation to proffer such information and was only

providing it in an effort to resolve the parties' dispute.[24]

### *Mahindra Wrongfully Rejects Global Vehicles' Second Order*

54.     On December 22, 2009, in a good faith effort to preserve the

relationship between the parties, and relying on Mahindra's most recent

announcement of a March, 2010 initial vehicle launch and the March 31, 2010

contractual Homologation date, Global Vehicles placed another vehicle order ("the

Second Order") to replace the First Order which had been wrongfully rejected by

Mahindra.   With the Second Order, Global Vehicles submitted details of its

financial arrangements and a projection of vehicle orders for the first year of

production, notwithstanding the fact that it had no contractual obligation to do so,

in a good faith effort to secure delivery of the vehicles.[25]

55.     True to form, Mahindra rejected the Second Order on December 30,

2009 claiming again that Global Vehicles had somehow failed to provide

---

[24]  A copy of Mahindra's December 11, 2009 correspondence is attached hereto as Exhibit N.

[25]  Copies of the December 22, 2009 correspondence and a print out of the Second Order, which was placed electronically, are attached hereto as Composite Exhibit O.  Due to the confidential nature of the financial information accompanying the December 22, 2009 letter, Global Vehicles is not submitting these documents at this time but will make them available for the Court's review at the appropriate time.

Mahindra's unilaterally imposed level of "financial security" for the order.[26]

56.     On January 7, 2010, Global Vehicles demanded that Mahindra immediately accept the Second Order and admonished Mahindra for its outrageous conduct.[27]

### *Mahindra Purposely Delays Completion of the Homologation Process*

57.     As noted above, the Distributor Agreement assigns to Mahindra the responsibility of successfully completing the Homologation process.

58.     However, Mahindra did not meet either the initial, August 31, 2009, Homologation completion date or the extended, March 31, 2010, date.

59.     As part of the Homologation process, Mahindra was required to conduct the emissions tests prescribed by the United States Environmental Protection Agency ("EPA tests") and the safety tests prescribed by the National Highway Traffic Safety Administration ("NHTSA tests") through authorized suppliers of these testing services.

60.     Under usual and customary circumstances, the process of completing the EPA and NHTSA tests does not exceed three years.

61.     However, rather than retaining the testing suppliers in a prompt and

---

[26]  A copy of Mahindra's December 30, 2009 correspondence is attached hereto as Exhibit P.

[27]  A copy of Global Vehicles' January 7, 2010 correspondence is attached hereto as Exhibit Q.

efficient manner upon execution of the Distributor Agreement in 2006, Mahindra, in bad faith, engaged in protracted contract negotiations for these services, which significantly delayed the commencement of the tests and has prolonged their completion date well beyond the normal three-year period.

62.     As a result of Mahindra's purposeful and bad faith dilatory conduct, the contractual Homologation date had to be extended to May 31, 2010 and extended subsequently to June 11, 2010.

63.     All conditions precedent to the maintenance of this action have been performed, waived or satisfied.

64.     Global Vehicles has retained the services of Legon Ponce & Fodiman, P.A. and is obligated to pay Legon Ponce & Fodiman, P.A.'s reasonable attorneys' fees in this matter.

**COUNT I**
**STATUS QUO PRELIMINARY AND PERMANENT**
**INJUNCTIVE RELIEF**

65.     Global Vehicles repeats and realleges each and every allegation contained in paragraphs 1 through 64 as though more fully set forth herein.

66.     Global Vehicles has initiated an arbitration proceeding in accordance with the Distributor Agreement's Arbitration Clause.

67.     The Arbitration Clause requires Mahindra to continue performing its

obligations under the Distributor Agreement during the pendency of the arbitration proceeding.

68.     Therefore, Global Vehicles is entitled to the issuance of a *status quo* injunction during the pendency of the arbitration proceeding:

A.     requiring Mahindra to continue performing its obligations under the Distributor Agreement;

B.     prohibiting Mahindra from selling vehicles in the United States through any distributor, or any other entity or individual, other than Global Vehicles, in contravention of the Distributor Agreement; and

C.     prohibiting Mahindra from communicating with any and all dealers who are members of the Global Vehicles dealer network.

69.     Additionally, Global Vehicles is entitled to the requested injunctive relief because:

(a)     Global Vehicles has a substantial likelihood of succeeding on the merits of its arbitration claims;

(b)     there is a substantial threat of irreparable injury to Global Vehicles if the requested injunctive relief is denied;

(c)     the threatened injury to Global Vehicles outweighs the injury that Mahindra would sustain should the requested injunctive relief be granted;

(d)    the requested injunction would not disserve the public interest.

70.    Finally, only a *de minimis* bond, if any, should be required for the entry of the requested injunction, given that the relief sought has been contractually agreed to by Mahindra.

WHEREFORE, Plaintiffs demand the entry of a preliminary and permanent injunction: (1) requiring Mahindra to continue performing its obligations under the Distributor Agreement; (2) prohibiting Mahindra from selling vehicles in the United States through any distributor, or other entity or individual, other than Global Vehicles, in contravention of the Distributor Agreement; and (3) prohibiting Mahindra from communicating with any and all dealers who are members of the Global Vehicles dealer network, all during the pendency of the arbitration proceeding instituted by Global Vehicles.

Dated: June 14, 2010

Respectfully submitted,

Richard A. Horder
Georgia Bar No. 366750
Kazmarek Geiger & Laseter LLP

3490 Piedmont Road NE, Suite 350
Atlanta, Georgia  30305
Tel.:  (404) 812-0843
Fax:   (404) 812-0845
rhorder@kglattorneys.com

and

Todd R. Legon
Alicia M. Otazo-Reyes
*Pro Hac Vice Application to be
Submitted*

Legon Ponce & Fodiman, PA
1111 Brickell Avenue, Suite 2150
Miami, Florida  33131
Tel.:  (305) 444-9991
Fax:  (305)444-9937
tlegon@lpflaw.com
aotazo@lpflaw.com

ATTORNEYS FOR PLAINTIFF
GLOBAL VEHICLES U.S.A., INC.

## CERTIFICATE OF COMPLIANCE WITH LR 5.1.C, NDGa

As required by LR 7.1.D, NDGa, I hereby certify that the foregoing pleading has been prepared with  14 point Times New Roman font in compliance with LR 5.1.C, NDGa.

Richard A. Horder
Georgia Bar No. 366750