**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **GLOBAL VEHICLES U.S.A., INC.,** | ) | |
| **a Nevada corporation with its principal** | ) | |
| **place of business in Alpharetta, Georgia,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE NO.** |
| | ) | |
| **v.** | ) | **1:10-CV-1818-JOF** |
| | ) | |
| | ) | |
| **Mahindra & Mahindra, LTD., a company** | ) | **JURY TRIAL DEMANDED** |
| **Incorporated and registered under the** | ) | |
| **Indian Companies Act of 1913,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**AMENDED COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF AND FOR DAMAGES**

Plaintiff, Global Vehicles U.S.A., Inc. ("Global Vehicles") by and through

its undersigned attorneys, sues Defendant Mahindra & Mahindra, Ltd.

("Mahindra") in this Amended Complaint for Injunctive and Declaratory Relief

and for Damages, and alleges as follows:

**NATURE OF THE ACTION**

1.      Global Vehicles is a United States corporation based in Alpharetta,

Georgia that is engaged in the distribution of motor vehicles in the United States.

- 1 -

2.      Mahindra is a company incorporated and registered under the Indian Companies Act of 1913 based in Mumbai, India that manufactures motor vehicles intended for export into the United States.

3.      On or about September 28, 2006, Global Vehicles and Mahindra executed a Distributor Agreement, whereby Global Vehicles became the exclusive distributor of Mahindra motor vehicles in the United States.[1]

4.      For close to four years, Global Vehicles has devoted its efforts to the development of a nation-wide network consisting of close to 350 automobile dealers who stand ready to sell and service Mahindra vehicles to American consumers once the vehicles have been certified to meet U.S. emissions and safety standards, a process called "Homologation."

5.      Global Vehicles has expended significant resources to achieve this level of readiness for the sale of Mahindra vehicles in the United States.

6.      Specifically, Global Vehicles has spent close to $35 million in preparation for the launch of Mahindra vehicles in the United States, including: an initial distributor appointment fee paid to Mahindra in the amount of $8.5 million;

---

[1]   Copies of the Distributor Agreement dated September 28, 2006, the First Amendment to Distributor Agreement dated April 20, 2007, the Second Amendment to Distributor Agreement dated March 27, 2010, and the Third Amendment to Distributor Agreement dated May 25, 2010 are attached hereto as Exhibits A, B-1, B-2 and B-3, respectively.

an investment of $1 million dollars to assist Mahindra in the development of a sports utility vehicle; and other significant sums of money for dealer development, brand development, sales advertising, logistics infrastructure, IT infrastructure, test vehicles, and administrative costs

7.     At the same time, Global Vehicles' dealers have paid over $60 million in franchise fees to secure their rights to sell Mahindra vehicles and many of the dealers have invested significant sums of money in upgrading their dealerships to accommodate the sale of Mahindra vehicles.

8.     In contrast to Global Vehicles' commitment to the venture, Mahindra has engaged in bad faith dilatory conduct with respect to its obligations under the Distributor Agreement and the wrongful rejection of the vehicle orders submitted by Global Vehicles.

9.     For example, on August 17, 2009, Global Vehicles placed a vehicle order with Mahindra that was supported by an irrevocable letter of credit, in compliance with the terms of the Distributor Agreement ("the First Order").

10.     However, on August 25, 2009, Mahindra rejected the First Order on the pretext that Global Vehicles had not provided sufficient evidence of its financial ability to pay for the vehicles and otherwise operate the distributorship

business, even though Global Vehicles has no such obligation under the terms of the Distributor Agreement.

11.     Specifically, Mahindra demanded that Global Vehicles comply with unilaterally imposed, wholly extra-contractual and onerous requirements such as providing to Mahindra trade financing commitments, letters of credit supporting anticipated vehicle orders, dealer floor plans and retail financing for a period of **three years** for the ostensible purpose of ensuring the continuity and stability of Global Vehicles' business.

12.     On December 22, 2009, in a good faith effort to preserve the relationship between the parties, Global Vehicles placed another vehicle order ("the Second Order") to replace the First Order which had been wrongfully rejected by Mahindra, and submitted details of its financial arrangements and a projection of vehicle orders for the first year of production, notwithstanding the fact that it had no contractual obligation to do so.

13.     However, on December 30, 2009, Mahindra rejected the Second Order on the pretext that Global Vehicles had not provided adequate "financial security" for the Second Order, the definition of which has never been provided and which is not even required under the Distributor Agreement.

14.     In addition to its wrongful rejection of the First Order and the Second

Order, Mahindra has in bad faith significantly delayed the completion of the above-described Homologation process.[2]

15.   Given Mahindra's wrongful conduct, Global Vehicles initiated an arbitration proceeding on June 11, 2010 in accordance with the Distributor Agreement's Arbitration Clause[3] for the sole purpose of compelling Mahindra to fulfill Global Vehicles' prior orders for motor vehicles so that Global Vehicles could sell those vehicles to the members of its Dealer Network.

16.   After Global Vehicles initiated that narrow arbitration proceeding and commenced this action for the purpose of obtaining a *status quo* injunction during the pendency of the arbitration, Mahindra declared in its filings with this Court that the Distributor Agreement had been terminated as of June 11, 2010, even though it had not complied with the required statutory or other notice to Global Vehicles. Further, Mahindra did not have good cause to declare a termination of the Distributor Agreement and its termination of the Agreement was in bad faith.

17.   As a result, Global Vehicles is filing this Amended Complaint,

---

[2]   The initial date for completion of Homologation under the terms of the Distributor Agreement was August 31, 2009. Exh. A, at ¶ 10. This date was extended to March 31, 2010 in the First Amendment to Distributor Agreement, Exh. B-1, at ¶ 2, and further extended to May 31, 2010 in the Second Amendment to Distributor Agreement, Exh. B-2, at ¶ 2, and further extended to June 11, 2010 in the Third Amendment to Distributor Agreement, Exh. B-3, at ¶2.

[3]   Exh. A, at ¶ 60.

wherein it seeks injunctive relief, as provided by the Distributor Agreement,[4] in the form of a *status quo* injunction to enforce the provision in the Arbitration Clause that requires Mahindra to continue performing its obligations under the Distributor Agreement during the pendency of the arbitration proceeding and to preserve the *status quo* given Mahindra's recent attempted wrongful termination.

18.  Additionally, Global Vehicles seeks declaratory relief, as provided by the Distributor Agreement,[5] in the form of a declaration of rights regarding the enforceability and/or scope of certain provisions of Distributor Agreement including, but not limited to: a) the choice of law provision in section 61 of the Distributor Agreement; b) the provision in section 10 of the Distributor Agreement, and in subsequent amendments to the Distributor Agreement,[6] upon which Mahindra relies for its attempted wrongful termination of the Distributor Agreement; c) the liquidated damages and limitation of liabilities provisions in sections 48 and 55 of the Distributor Agreement; and d) the venue provision contained in section 60(b) of the Distributor Agreement.

19.  Finally, Global Vehicles asserts statutory claims against Mahindra pursuant to the federal Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221 -

---

[4] Id. at ¶ 63.
[5] Id.
[6] See Exh. B-1, at ¶ 2; Exh. B-2, at ¶ 2; Exh. B-3, at ¶ 2.

1226, and the Georgia Motor Vehicle Franchise Practices Act, Ga. Code §§ 10-1-620 *et seq.*

## THE PARTIES

20.    Global Vehicles is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Alpharetta, Georgia.

21.    Mahindra is a company incorporated and registered under the Indian Companies Act of 1913, with its principal place of business in Mumbai, India.

## SUBJECT MATTER JURISDICTION AND VENUE

22.    This Court has diversity jurisdiction over this case pursuant to Title 28, United States Code, Section 1332(a)(2) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State of the United States and a citizen of a foreign state.

23.    This Court also has jurisdiction over this case pursuant to Title 15, United States Code, Section 1222.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

25.    Venue is also proper in this District because this action seeks a

determination of rights created by the Distributor Agreement pursuant to the Georgia Motor Vehicle Franchise Practices Act.  Specifically, Ga. Code § 10-1-623(f) provides that venue is proper in the county in which Global Vehicles engaged in the business of selling Mahindra's products, namely, Fulton County, and that Mahindra shall be deemed to reside in such county for venue purposes.

## **PERSONAL JURISDICTION**

26.     This Court has personal jurisdiction over Mahindra because, under the terms of the Distributor Agreement between the parties, Mahindra consented to the institution of an action for injunctive relief and other equitable relief, such as the instant action, in the local or federal courts of the United States.[7]

27.     This Court also has personal jurisdiction over Mahindra pursuant to Ga. Code § 9-10-91 (1) because this action arises from Mahindra's transacting business within Georgia.

28.     This Court also has personal jurisdiction over Mahindra pursuant to Ga. Code § 10-1-624(a) because Mahindra engages, either directly or indirectly, in purposeful contacts within Georgia in connection with the offering of advertising for sale, or has business dealings with respect to, a new motor vehicle sale within Georgia.  Such business dealings include, but are not limited to, Mahindra's entry

---

[7] Exh. A, at ¶ 63.

into a Services Agreement with its wholly owned subsidiary, which has an office in Calhoun, Georgia, for the stated purpose of Mahindra's launch of "its new range of vehicles ('M&M Vehicles') in the United States of America."[8]

29.    Additionally, Mahindra has established significant contacts with Georgia as its key personnel have entered the forum state on numerous occasions in connection with the introduction of Mahindra vehicles in the United States.  For example:

a. Dr. Pawan Goenka, the president of Mahindra's automotive sector, attended multiple meetings at Global Vehicles' offices located in Alpharetta, Georgia related to the introduction of Mahindra vehicles in the United States in furtherance of and accordance with the Distributor Agreement, *at least 7 times*: 10/5/06;  4/16/07;  8/31/07;  5/19/08;  8/27/08;  5/8/09;  and 5/11/09.

b. Pravin Shah, a member of Mahindra's Executive Board and Mahindra's Chief Executive, International Operations, Automotive & Farm Equipment Sectors, also attended multiple

---

[8]  The Services Agreement is attached as an exhibit to the Declaration of Sanjeev Mohoni in support of Mahindra's Motion to Dismiss and Compel Arbitration [D.E. 15-4].

meetings at Global Vehicles' offices located in Alpharetta, Georgia related to the introduction of Mahindra vehicles in the United States in furtherance of and accordance with the Distributor Agreement, *at least 9 times*:   10/5/06; 4/16/07; 5/21/07; 8/6/07; 5/19/08; 8/27/08; 3/5/09; 5/8/09; and 5/11/09.

c. Sanjeev Mohoni, Mahindra's Vice President – New Projects, Automotive Sector, visited various locations within Georgia and attended multiple meetings at Global Vehicles' offices located in Alpharetta, Georgia related to the introduction of Mahindra vehicles in the United States in furtherance of and accordance with the Distributor Agreement, *at least 22 times, as follows*:   Global Vehicles' offices on 8/13/07, 8/31/07, 5/19/08, 12/16/08, 3/5/09, 5/8/09, 6/25/09, 8/17/09, 9/9/09, 11/5/09, 11/10/09, 11/26/09, 11/30/09, 12/4/09, 12/5/09, 1/25/10, 3/3/10, 3/30/10, and 6/7-11/10; Brunswick Port on 10/13-15/09; Sunbelt Agricultural Expo in Moultrie on 10/21/09; and Atlanta on 4/14/10.  Additionally, Mr. Mohoni relocated from India to Calhoun on 9/9/09.

      d.  Mr. Mohoni's business cards reflect that he is employed by Mahindra & Mahindra Ltd.  Further, on at least two occasions in 2010 (April 14 and June 7-11), he held himself out as the representative of Mahindra in his dealings with Global Vehicles in connection with the Distributor Agreement.

      e.  Mr. Shah, Dr. Goenka, and/or Mr. Mohoni have also attended meetings related to the introduction of Mahindra vehicles in other states including, but not limited to, Michigan, New York, Florida, and Texas.

## **FACTUAL ALLEGATIONS**

### ***Global Vehicles and Mahindra Enter into the Distributor Agreement***

30.    In early 2006, Global Vehicles and Mahindra commenced negotiations for the appointment of Global Vehicles as the exclusive distributor of Mahindra vehicles in the United States.

31.    To this end, the parties executed a Letter of Intent on January 20, 2006 and a Memorandum of Understanding on March 10, 2006.

32.    Ultimately, on September 28, 2006, Global Vehicles and Mahindra executed a comprehensive Distributor Agreement.

33.    Pursuant to the Distributor Agreement, Mahindra granted Global

Vehicles the exclusive right to distribute Mahindra vehicles in the United States for an initial term of ten years, with an optional renewal term of five additional years, in exchange for Global Vehicles' duly made payment of an appointment fee in the amount of $8.5 million.[9]

34.    Global Vehicles, in turn, agreed to appoint suitable automobile dealers authorized to sell Mahindra vehicles throughout the United States.[10]

35.    At the time of execution of the Distributor Agreement, the parties contemplated that the first model of Mahindra vehicles designed for importation into the United States would be available for shipment in August, 2008, with subsequent models available in August, 2009 and the fourth quarter of fiscal year 2010 (*i.e.*, first calendar quarter of 2011).[11]   However, Mahindra was unable to comply with this requirement.

36.    Therefore, pursuant to the First Amendment to Distributor Agreement executed on April 20, 2007, the dates when Mahindra vehicles would be available for shipment were delayed, due solely to Mahindra's actions or inaction, to January-March 2009 for the first model, September 2009 for the second model, the

---

[9]  Exh. A, at ¶¶ 3, 4.
[10]  To date, Global Vehicles has appointed close to 350 such dealers.
[11]  Exh. A, Annexure IV.

end of 2009 for the third model, and January-March, 2011 for the fourth model.[12] Global Vehicles agreed to this amendment in a good faith effort to provide Mahindra additional time to comply with its obligations to manufacture and deliver the vehicles to Global Vehicles.

37.    The Distributor Agreement assigns to Mahindra the responsibility of obtaining certifications that the Mahindra vehicles to be imported into the United States meet Federal Motor Vehicle Safety Standards and Vehicle Emissions Control Requirements, a process referred to as "Homologation."[13]

38.    Under the terms of the Distributor Agreement, vehicle orders are to be secured solely by an irrevocable letter of credit in favor of Mahindra and payment for the vehicles is to be effectuated via international wire transfer within ten (10) days from receipt of the vehicles at the designated port of delivery.[14]

39.    Global Vehicles has no duty to place any vehicle orders until the "Homologation" process is completed.[15]

40.    The initial date for completion of the Homologation process of August 31, 2009 has been extended three times by mutual agreement of the parties—first

---

[12]  Exh. B-1, Annexure II.  Mahindra did not meet any of the 2009 dates.
[13]  Exh. A, at ¶ 10.
[14]  Exh. A, at ¶ 15.
[15]  Exh. A, at ¶ 17.

to March 31, 2010, then to May 31, 2010, and subsequently to June 11, 2010.[16] Once again, Global Vehicles agreed to these extensions in a good faith effort to provide Mahindra additional time to comply with its obligations to manufacture and deliver the vehicles to Global Vehicles.

### *Mahindra Unilaterally Attempts to Impose Extra-Contractual and Onerous Conditions on Global Vehicles*

41.    In 2008, in anticipation of the availability of Mahindra vehicles for shipment by early 2009, Global Vehicles engaged in the process of securing from established financial institutions the required financing for the purchase of the initial vehicle order.

42.    However, after Mahindra delayed the launch of the vehicles beyond the anticipated January-March, 2009 time frame, these financial institutions ceased negotiations with Global Vehicles due to the uncertainty of the launch date caused by Mahindra.

43.    Notwithstanding the fact that Global Vehicles was still pursuing independent financing that was necessarily contingent upon a certain launch date, at a meeting held in Sarasota, Florida on May 12, 2009, Mahindra suggested that Global Vehicles, instead, secure an equity "strategic partner" to be approved by

---

[16] Exh. A, at ¶ 10; Exh. B-1, at ¶ 2; Exh. B-2, at ¶ 2; Exh. B-3, at ¶ 2.  To date, the Homologation process has not been completed.

Mahindra that would assist Global Vehicles with obtaining vehicle financing. Mahindra went on to "suggest" that this financing be for a greater amount than initially contemplated or required under the Distributor Agreement.

44.     While Global Vehicles was under no such obligation under the terms of the Distributor Agreement and that such efforts would detract from other company priorities, Global Vehicles agreed to pursue Mahindra's suggestion and immediately commenced efforts to obtain a strategic equity partner.

45.     On June 15 and 16, 2009, the parties met in Mumbai, India to address issues related to the launch of Mahindra vehicles, which by then had been delayed to the late 2009 to early 2010 timeframe.

46.     At that time, Mahindra once again continued in its attempts to impose extra-contractual duties on Global Vehicles by demanding that Global Vehicles place larger vehicle orders than originally contemplated or projected, even though the condition for the placing of such orders—successful Homologation of the vehicles—had not yet occurred, and otherwise secure commensurate financing both for itself and its dealers for these larger orders.

47.     In its continuing good faith efforts to preserve the parties' relationship, Global Vehicles engaged in extensive efforts to satisfy Mahindra's demands by approaching potential strategic equity partners and potential sources of

financing alike.

48.    On July 15, 2009, Global Vehicles submitted to Mahindra a report of those efforts.[17]

49.    On July 17, 2009, Global Vehicles was stunned to receive correspondence from Mahindra wherein the latter advised Global Vehicles that it would not be meeting the projected December 2009 vehicle launch and that it was putting on hold its plans to manufacture vehicles for sale in the United States.[18]

50.    Notwithstanding that the excessive "financing" Mahindra had demanded Global Vehicles obtain was not required under the Distributor Agreement, the fact of the matter was that Global Vehicles did have sufficient financing in place to secure its vehicle orders per the Distributor Agreement. Consequently, given Mahindra's prior assurances that the Homologation process would be completed by October, 2009, Global Vehicles advised Mahindra on July 24, 2009 that it would be placing its initial vehicle order on August 17, 2009 in time for late 2009 delivery.[19]

51.    On August 7, 2009, Mahindra responded to Global Vehicles' letter

---

[17]   A copy of Global Vehicles' July 15, 2009 correspondence is attached hereto as Exhibit C.

[18]    A copy of Mahindra's July 17, 2009 correspondence is attached hereto as Exhibit D.

[19]   A copy of Global Vehicles' July 24, 2009 correspondence is attached hereto as Exhibit E.

demanding concrete evidence of Global Vehicles having obtained "financial backing" to support its vehicle orders before it would proceed with the necessary steps for the Mahindra vehicle launch.[20]  Once again, this "financial backing" was undefined.

### *Mahindra Wrongfully Rejects Global Vehicles' First Order*

52.    On August 17, 2009, notwithstanding Mahindra's continuing delay of the completion of the Homologation process and failure to meet the initial vehicle delivery dates, but in anticipation that these delays would be cured, Global Vehicles placed its initial vehicle order with Mahindra supported by an irrevocable letter of credit, in compliance with the terms of the Distributor Agreement ("the First Order").[21]

53.    However, by correspondence dated August 25, 2009, Mahindra rejected the First Order on the pretextual grounds that Global Vehicles had not provided the required payment guarantee and had not otherwise demonstrated the financial ability to pay for this and future orders. [22]

54.    Specifically, Mahindra again demanded that Global Vehicles satisfy

---

[20]   A copy of Mahindra's August 7, 2009 correspondence is attached hereto as Exhibit F.

[21]   A copy of the First Order is attached hereto as Exhibit G.

[22]   A copy of Mahindra's August 25, 2009 correspondence is attached hereto as Exhibit H.

numerous unilaterally imposed and wholly extra-contractual and onerous conditions by supplying to Mahindra extensive financial documentation of, among other things, Global Vehicles' working capital, trade financing, letters of credit supporting future orders, proof of funding for future advertising and product support endeavors, dealer floor plans and retail financing, all for a period of **three years** hence.[23]

55.     On August 28, 2009, Global Vehicles, through counsel, responded to Mahindra's rejection of the First Order and advised that the rejection was a material breach of the Distributor Agreement, specifically refuting each and every reason advanced by Mahindra as purported justification for such rejection, including the above-mentioned unilaterally imposed demands for three years worth of detailed financial information.[24]

56.     Thereafter, the parties engaged in an exchange of correspondence wherein each maintained its earlier position, with Mahindra ultimately invoking the executive level dispute resolution provisions contained in the Distributor Agreement's Arbitration Clause.[25]

---

[23]  Exh. H, at 2.

[24]  A copy of Global Vehicles' August 28, 2009 correspondence is attached hereto as Exhibit I.

[25]  Copies of this correspondence, dated September 9, 2009, September 17, 2009 and September 30, 2009 are attached hereto as Exhibits J, K, and L, respectively.

57.     As a result of Mahindra's request for an executive level review, the parties met in New York City on November 3, 2009 to address the issues that had arisen in relation to the Distributor Agreement.

58.     At the conclusion of the meeting, the parties agreed to engage in further communications with respect to three specific issues, which Global Vehicles addressed in correspondence dated November 30, 2009.[26]

59.     Therein, Global Vehicles informed Mahindra, among other things, that it had secured trade financing from a third party.  Global Vehicles also provided to Mahindra its Trade Finance Program as per Distributor Agreement and Pro Forma Operational Income and Cash Flow Projections for the fifteen-month period from December, 2009 to February, 2011, reflecting the first year projections for anticipated order volumes assuming completion of the Homologation process by December 17, 2009 and demonstrating Global Vehicles' ability to both assist with the marketing of the vehicles and sustain its day to day business operations.[27]

---

See also Exh. A, at ¶ 60(a).

[26]   A copy of Global Vehicles' November 30, 2009 correspondence is attached hereto as Exhibit M.

[27]   Exh. M, at 1.  Due to the confidential nature of the Trade Finance Program and Pro Forma Operational Income and Cash Flow Projections, Global Vehicles is not submitting these documents at this time but will make them available for the Court's review at the appropriate time.

60.   On December 11, 2009, Mahindra once again rejected Global Vehicles' proffer, repeating its now overused and vague mantra that the financial information being provided was somehow "insufficient," notwithstanding the fact that Global Vehicles was under no obligation to proffer such information.[28]

### *Mahindra Wrongfully Rejects Global Vehicles' Second Order*

61.   On December 22, 2009, in a good faith effort to preserve the relationship between the parties, and relying on Mahindra's most recent announcement of a March, 2010 initial vehicle launch and the March 31, 2010 contractual Homologation date, Global Vehicles placed another vehicle order ("the Second Order") to replace the First Order which had been wrongfully rejected by Mahindra.   With the Second Order, Global Vehicles submitted details of its financial arrangements and a projection of vehicle orders for the first year of production, notwithstanding the fact that it had no contractual obligation to do so, in a good faith effort to secure delivery of the vehicles. [29]

62.   True to form, Mahindra rejected the Second Order on December 30,

---

[28]   A copy of Mahindra's December 11, 2009 correspondence is attached hereto as Exhibit N.

[29]   Copies of the December 22, 2009 correspondence and a print out of the Second Order, which was placed electronically, are attached hereto as Composite Exhibit O.   Due to the confidential nature of the financial information accompanying the December 22, 2009 letter, Global Vehicles is not submitting these documents at this time but will make them available for the Court's review at the appropriate time.

2009 claiming again that Global Vehicles had somehow failed to provide Mahindra's unilaterally imposed level of "financial security" for the order.[30]

63.    On January 7, 2010, Global Vehicles demanded that Mahindra immediately accept the Second Order and admonished Mahindra for its outrageous conduct.[31]

### ***Mahindra Purposely Delays Completion of the Homologation Process***

64.    As noted above, the Distributor Agreement assigns to Mahindra the responsibility of successfully completing the Homologation process.

65.    However, Mahindra did not meet either the initial, August 31, 2009, Homologation completion date or the extended, March 31, 2010, date.

66.    As part of the Homologation process, Mahindra was required to conduct the emissions tests prescribed by the United States Environmental Protection Agency ("EPA tests") and the safety tests prescribed by the National Highway Traffic Safety Administration ("NHTSA tests") through authorized suppliers of these testing services.

67.    Under usual and customary circumstances, the process of completing the EPA and NHTSA tests does not exceed three years.

---

[30]  A copy of Mahindra's December 30, 2009 correspondence is attached hereto as Exhibit P.

[31]  A copy of Global Vehicles' January 7, 2010 correspondence is attached hereto as Exhibit Q.

68.     However, rather than retaining the testing suppliers in a prompt and efficient manner upon execution of the Distributor Agreement in 2006, Mahindra, in bad faith, engaged in protracted contract negotiations for these services, which significantly delayed the commencement of the tests and has prolonged their completion date well beyond the normal three-year period.

69.     As a result of Mahindra's purposeful and bad faith dilatory conduct, the contractual Homologation date had to be extended to May 31, 2010 and extended subsequently to June 11, 2010.

### *Mahindra Wrongfully Attempts to Terminate the Distributor Agreement In Violation of Federal and Georgia Law*

70.     Global Vehicles initiated arbitration proceedings on June 11, 2010 for the sole purpose of compelling Mahindra to fulfill Global Vehicles' prior orders for motor vehicles so that Global Vehicles could sell those vehicles to the members of its Dealer Network.

71.     On June 14, 2010, Global Vehicles initiated the instant action seeking an injunction to preserve the *status quo* during the pendency of the arbitration.

72.     Even though there are six (6) years remaining as to the term of the Distributor Agreement,[32] Mahindra has now wrongfully attempted to terminate the

---

[32]  The Distributor Agreement has an initial ten (10) year term through September 28, 2016.  Exh. A, at ¶ 4.

Distributor Agreement.  Specifically, in moving papers submitted in this action on June 28 and 29, 2010 [D.E. 15, 19], Mahindra repeatedly declared that the Distributor Agreement was terminated on June 11, 2010, pursuant to Section 10 of the Distributor Agreement.[33]

73.    Mahindra's attempted termination does not comport with section 46 the Distributor Agreement, which lists the permissible causes for termination by Mahindra.

74.    Further, Mahindra's attempted termination violates the Georgia Motor Vehicle Franchise Practices Act, Ga. Code §§ 10-1-620 *et seq.*, both procedurally and substantively.[34]  Specifically, Mahindra failed to provide to Global Vehicles the 90-day written statutory notice advising Global Vehicles of its intent to terminate the Distributor Agreement, as required by the Act, Ga. Code §§ 10-1-651(a)(1) and (e).  Additionally, because Mahindra does not have good cause for

---

[33] Section 10 includes a handwritten addendum which states: "Achievement of U.S. safety, emission and homologation standards is the essence of this agreement. Failure to achieve them by August 31, 2009 will render this agreement void with no liability on either side."  Exh. A, at ¶ 10.  As previously noted, the August 31, 2009 date was subsequently extended to March 31, 2010, May 31, 2010 and June 11, 2010.  Exh. B-1, at ¶ 2; Exh. B-2, at ¶ 2; Exh. B-3, at ¶ 2.

[34]    The Georgia Motor Vehicle Franchise Practices Act provides that "All procedures, protections, and remedies afforded to a motor vehicle dealer under this Code section shall be available to a motor vehicle distributor whose distributor agreement is terminated, canceled, not renewed, modified, or replaced by a manufacturer or an importer."  Ga. Code Section 10-1-651(k) (former Section 10-1-651(j)).

its attempted termination of the Distributor Agreement, its conduct violates the Act, Ga. Code § 10-1-651(a)(2).

75.     Mahindra's attempted termination also violates the federal Automobile Dealers Day in Court Act, 15 U.S.C. § 1222, because Mahindra failed to act in good faith in performing or complying with the terms of the Distributor Agreement and failed to act in good faith in its purported termination of the Distributor Agreement.

76.     Specifically, Mahindra, through its conduct and course of dealing with Global Vehicles, has on repeated occasions coerced and intimidated Global Vehicles by threatening to improperly terminate the Distributor Agreement unless Global complied with Mahindra's unfair and unreasonable demands.

77.     Global Vehicles has not expressly consented, and will not expressly consent, to arbitrate its federal statutory claims, as required by the Motor Vehicle Franchise Contract Arbitration Fairness Act, 15 U.S.C. § 1226.

78.     All conditions precedent to the maintenance of this action have been performed, waived or satisfied.

79.     Global Vehicles has retained the services of Legon Ponce & Fodiman, P.A. and is obligated to pay Legon Ponce & Fodiman, P.A.'s reasonable attorneys' fees in this matter.

## COUNT I
## STATUS QUO PRELIMINARY AND PERMANENT
## INJUNCTIVE RELIEF

80.     Global Vehicles repeats and realleges each and every allegation contained in paragraphs 1 through 79 as though more fully set forth herein.

81.     Global Vehicles has initiated an arbitration proceeding in accordance with the Distributor Agreement's Arbitration Clause.

82.     The Arbitration Clause requires Mahindra to continue performing its obligations under the Distributor Agreement during the pendency of the arbitration proceeding.  Therefore, Global Vehicles is entitled to the issuance of a *status quo* injunction during the pendency of the arbitration proceeding.

83.     Additionally, under the terms of the Distributor Agreement, Global Vehicles is entitled to seek injunctive relief to preserve the *status quo* given Mahindra's recent attempted wrongful termination.

84.     Accordingly, Global Vehicles request the issuance of a *status quo* injunction:

        A.     requiring Mahindra to continue performing its obligations under the Distributor Agreement;

        B.     prohibiting Mahindra from selling vehicles in the United States through any distributor, or any other entity or individual, other than Global

Vehicles, in contravention of the Distributor Agreement; and

C.    prohibiting Mahindra from communicating with any and all dealers who are members of the Global Vehicles dealer network.

85.    Global Vehicles is entitled to the requested injunctive relief because:

(a)    Global Vehicles has a substantial likelihood of succeeding on the merits of its arbitration claims;

(b)    there is a substantial threat of irreparable injury to Global Vehicles if the requested injunctive relief is denied;

(c)    the threatened injury to Global Vehicles outweighs the injury that Mahindra would sustain should the requested injunctive relief be granted;

(d)    the requested injunction would not disserve the public interest.

86.    Finally, only a *de minimis* bond, if any, should be required for the entry of the requested injunction, given that the relief sought has been contractually agreed to by Mahindra.

WHEREFORE, Plaintiff demands the entry of a preliminary and permanent injunction: (1) requiring Mahindra to continue performing its obligations under the Distributor Agreement; (2) prohibiting Mahindra from selling vehicles in the United States through any distributor, or other entity or individual, other than Global Vehicles, in contravention of the Distributor Agreement; and (3)

prohibiting Mahindra from communicating with any and all dealers who are members of the Global Vehicles dealer network, all during the pendency of the arbitration proceeding instituted by Global Vehicles and the adjudication of Global Vehicles' claims in this action.

## COUNT II
## DECLARATORY JUDGMENT

87.    Global Vehicles repeats and realleges each and every allegation contained in paragraphs 1 through 79 as though more fully set forth herein.

88.    This is an action for declaratory judgment for the purpose of determining questions of actual controversy between the parties as more fully set forth in this amended complaint.  Specifically, Global Vehicles seeks a declaration of rights between it and Mahindra arising from their Distributor Agreement, pursuant to 28 U.S.C. § 2201, Rule 57 of the Federal Rules of Civil Procedure, and Section 63 of the Distributor Agreement, which provides that the parties shall be entitled to seek injunctive or other equitable relief, such as a declaratory judgment, in the local or federal courts of the United States.

89.    Section 61 of the Distributor Agreement states that "any provision herein the performance of which contravenes the laws in and for the Territory, shall be deemed not to be part of this Distributor Agreement." (emphasis added). The United States of America, including the State of Georgia, constitute the

"Territory" as defined in Section 1(lll) of the Distributor Agreement.

90.    Moreover, under Georgia law, any provisions of any franchise agreement which is in violation of the Georgia Motor Vehicle Franchise Practices Act "shall be deemed null and void and without force and effect,"  Ga. Code § 10-1-24(c); and "[t]he applicability of [the Act] shall not be affected by a choice of law clause in any franchise, agreement, waiver, novation, or any other written instrument."  Ga. Code § 10-1-624(b) (emphasis added).

91.    Various provisions contained within the Distributor Agreement do contravene the Georgia Motor Vehicle Franchise Practices Act, as well as the federal Automobile Dealers Day in Court Act.   Accordingly, Global Vehicles requests that the Court declare unenforceable the following provisions in the Distributor Agreement that violate Georgia and/or federal law.

92.    Choice of Law:  With respect to the choice of law provision appearing in section 61 of the Distributor Agreement, the Court should declare that United Kingdom law does not govern the Distributor Agreement, to the extent that such law differs or conflicts with the Georgia Motor Vehicle Franchise Practices Act and/or the federal Automobile Dealers Day in Court Act.

93.    Purported Termination:  With respect to the purported termination of the Distributor Agreement for failure to achieve Homologation by a date certain

contained in section 10 of the agreement, as amended, the Court should declare that such purported termination provision is unenforceable because it conflicts with federal and Georgia law as it contravenes the following statutory requirements of notice and good faith or good cause:

    a.  Section 10-1-651(a)(1) of the Georgia Motor Vehicle Franchise Practices Act, which provides that "<u>notwithstanding</u> the terms, provisions, or conditions of any franchise . . . no franchisor shall cancel, terminate, or fail to renew any franchise with a dealer unless the franchisor: (1) <u>has satisfied the notice requirement of subsection (e)</u> of this Code section." (emphasis added).  Such statutory notice must be served not less than **90 days prior** to the effective date of the termination, be in writing, and include a statement of intention to terminate, the reasons for termination, and the date on which termination is to take effect.  Ga. Code § 10-1-651(e).

    b.  Section 10-1-651(a)(2) of the Georgia Motor Vehicle Franchise Practices Act, which provides that "<u>notwithstanding</u> the terms, provisions, or conditions of any franchise . . . no franchisor shall cancel, terminate, or fail to renew any franchise with a

dealer unless the franchisor: . . . (2) <u>has good cause for cancellation, termination, or nonrenewal</u>." (emphasis added).

c. The federal Automobile Dealers Day in Court Act, which provides that suit may be brought against any automobile manufacturer engaged in commerce for failure of the manufacturer "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

94. <u>Liquidated Damages / Limitation of Liabilities</u>: With respect to the liquidated damages and limitation of liabilities provisions appearing in sections 48 and 55 of the Distributor Agreement, the Court should declare such provisions unenforceable because they conflict with federal and Georgia law as they limit damages to the liquidated sum of $8.5 million, and prohibit the recovery of any special, indirect, punitive, incidental or consequential damages, which are statutorily available, as follows:

a. Section 10-1-623(a) of the Georgia Motor Vehicle Franchise Practices Act provides that "<u>notwithstanding</u> the terms, provisions, or conditions of any agreement or franchise . . . any

person who is or may be injured by a violation of a provision of this [Act] . . . may bring an action in any court of competent jurisdiction for damages and equitable relief" for "<u>actual pecuniary loss</u>." (emphasis added).

b. Section 10-1-651(i) Georgia Motor Vehicle Franchise Practices Act allows recovery, in cases where a manufacturer fails to prove good cause for termination of a vehicle franchise agreement, of "<u>the value of the dealership as an ongoing business</u>." (emphasis added).

c. Section 10-1-623(b) of the Georgia Motor Vehicle Franchise Practices Act provides for an award of "punitive damages in addition to any other damages authorized" for "aggravated or continued multiple intentional violations" of the Act.

d. Section 10-1-628 of the Georgia Motor Vehicle Franchise Practices Act provides for an award of attorneys' fees to the prevailing party.

e. The federal Automobile Dealers Day in Court Act provides for the recovery of damages "sustained and the cost of suit" by reason of any automobile manufacturer's failure to act in good

faith in terminating a vehicle franchise.  15 U.S.C. § 1222.

95.  <u>Venue Provision</u>:  With respect to the venue provision in section 60(b) of the Distributor Agreement, stating that the place of the arbitration shall be London, England, the Court should declare such provision unenforceable with respect to any statutory claims arising under the Georgia Motor Vehicle Franchise Practices Act.  Specifically, Section 61 of the Distributor Agreement states that "any provision herein the performance of which <u>contravenes the laws</u> in and for the Territory, shall be <u>deemed not to be part of this Distributor Agreement</u>." (emphasis added).  Further, the Georgia Motor Vehicle Franchise Practices Act provides that venue for claims arising under it shall be in Georgia and that "[a]ny provision in a franchise agreement whereby the parties "determine, agree to, control, restrict, establish, limit or direct the venue in which a cause of action under the Act shall be brought "<u>shall be void</u>."  Ga. Code § 10-1-623(f) (emphasis added).  Given the foregoing contractual provision, which assures that the contravening venue provision in the Georgia statute will govern, there can be no meeting of the minds between the parties for laying venue in London for any statutory claims arising under the Georgia Motor Vehicle Franchise Practices Act.

WHEREFORE, Plaintiff demands entry of a declaratory judgment declaring that: (1) the choice of law provision appearing in section 61 of the Distributor

Agreement is unenforceable to the extent United Kingdom law conflicts with the provisions of the Georgia Motor Vehicle Franchise Practices Act and/or the federal Automobile Dealers Day in Court Act; (2) the purported termination provision for failure to achieve Homologation appearing in section 10 of the Distributor Agreement, as amended, is unenforceable; (3) the liquidated damages and limitation of liabilities provisions appearing in sections 48 and 55 of the Distributor Agreement are unenforceable; (4) the venue provision appearing in section 60(b) of the Distributor Agreement is unenforceable with respect to any statutory claims arising under the Georgia Motor Vehicle Franchise Practices Act; and (5) providing for such further relief deemed just and proper.

## COUNT III
## VIOLATION OF THE AUTOMOBILE DEALERS DAY IN COURT ACT
## (15 U.S.C. § 1222)

96.     Global Vehicles repeats and realleges each and every allegation contained in paragraphs 1 through 79 as though more fully set forth herein.

97.     This is an action for damages arising from Mahindra's violation of the Automobile Dealers Day in Court Act, 15 U.S.C. § 1222.

98.     As more fully set forth in the factual allegations above, Mahindra's attempted termination and its conduct in performing or complying with the terms of the Distributor Agreement lacked good faith and was coercive and intimidating,

thus violating the Automobile Dealers Day in Court Act, 15 U.S.C. § 1222.

99.    As a result of Mahindra's coercive and intimidating conduct, Global Vehicles has suffered damages.

100.   Pursuant to 15 U.S.C. § 1226, Global Vehicles has not expressly consented, and will not consent to arbitrate the instant claim for violation of the Automobile Dealers Day in Court Act, and expressly elects to pursue this claim in District Court.

WHEREFORE, Plaintiff demands entry of a judgment for damages and costs of suit pursuant to 15 U.S.C. § 1222, interest, and for such further relief deemed just and proper.

## COUNT IV
## VIOLATION OF THE GEORGIA MOTOR VEHICLE FRANCHISE PRACTICES ACT
### (Ga. Code § 10-1-620 *et seq.*)

101.   Global Vehicles repeats and realleges each and every allegation contained in paragraphs 1 through 79 as though more fully set forth herein.

102.   This is an action for damages arising from Mahindra's violation of the Georgia Motor Vehicle Franchise Practices Act (Ga. Code §§ 10-1-620 *et seq.*)  as a result of its attempted termination of the Distributor Agreement between it and Global Vehicles without notice and without good cause.

103.   As more fully set forth above, Mahindra's attempted termination

violates the Georgia Motor Vehicle Franchise Practices Act, because Mahindra failed to provide the requisite written statutory notice of its intent to terminate the Distributor Agreement.  Specifically, Mahindra failed to serve a written notice of termination at least **90 days prior** to the effective date of the termination, and in so doing, failed to provide a statement of intention to terminate, the reasons for termination, and the date on which termination is to take effect – all in violation of Ga. Code §10-1-651(e).

104.   Mahindra's attempted termination also violates the Georgia Motor Vehicle Franchise Practices Act because Mahindra does not have good cause for the termination of the Distributor Agreement, as required by Ga. Code § 10-1-651(a)(2).

105.   As a result of Mahindra's violations of the Georgia Motor Vehicle Franchise Practices Act, Global Vehicles has suffered damages.

106.   Further, as there are "aggravated or continued multiple intentional violations" of the Georgia Motor Vehicle Franchise Practices Act, Global Vehicles seeks an award of punitive damages in this action pursuant to Ga. Code § 10-1-623(b).

107.   Finally, Global Vehicles also seeks an award of its attorneys' fees and costs for this claim pursuant to Ga. Code § 10-1-628.

WHEREFORE, Plaintiff demands entry of a judgment for damages, punitive damages, interest, attorneys' fees and costs, and such further relief deemed just and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.


Dated: July 6, 2010                                   Respectfully submitted,


                                                      /s/ Richard A. Horder
                                                      Richard A. Horder
                                                      Georgia Bar No. 366750
                                                      Kazmarek Geiger & Laseter LLP
                                                      3490 Piedmont Road NE, Suite 350
                                                      Atlanta, Georgia  30305
                                                      Tel.:  (404) 812-0843
                                                      Fax:   (404) 812-0845
                                                      rhorder@kglattorneys.com

                                                              and

Todd R. Legon
Alicia M. Otazo-Reyes
William F. Rhodes
*Admitted Pro Hac Vice*
Legon Ponce & Fodiman, PA
1111 Brickell Avenue, Suite 2150
Miami, Florida  33131
Tel.:  (305) 444-9991
Fax:  (305)444-9937
tlegon@lpflaw.com
aotazo@lpflaw.com

ATTORNEYS FOR PLAINTIFF
GLOBAL VEHICLES U.S.A., INC.

## <u>CERTIFICATE OF COMPLIANCE WITH LR 5.1.C, NDGa</u>

As required by LR 7.1.D, NDGa, I hereby certify that the foregoing pleading has been prepared with  14 point Times New Roman font in compliance with LR 5.1.C, NDGa.

/s/ Richard A. Horder            _
Richard A. Horder
Georgia Bar No. 366750

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served via ECF System this

6th day of July, 2010 on all counsel of record listed below:

      Dwight J. Davis
      Meghan H. Magruder
      Brian A. White
      Shelby S. Guilbert, Jr.
      1180 Peachtree Street, NE
      Atlanta, Georgia  30309

                          /s/ Richard A. Horder
                          Richard A. Horder
                          Georgia Bar No. 366750